Filed 7/27/21

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of L.R. and K.A. | D077533 |
| L.R.,<br><br>    Appellant,<br><br>    v.<br><br>K.A.,<br><br>    Respondent. | (Super. Ct. No. D557861) |

APPEAL from an order of the Superior Court of San Diego County, Marcella O. McLaughlin, Judge.  Reversed.

L. R., in pro. per.; Elyse B. Butler and Chalsie D. Keller for Appellant. [*Retained.*]

Linda Cianciolo for Respondent.

## INTRODUCTION

After a two-day evidentiary hearing, the trial court found L.R.[1] (Mother) to be obsessive, aggressive, manipulative, and controlling of K.A. (Father) during a two-hour urgent care visit with the parties' sick minor child—an incident described by the responding police officer as "boil[ing] down to being a child custody dispute."  The incident ended with Mother, who did not have physical custody, taking the child home in violation of the child custody and visitation order.  Finding Mother's conduct disturbed Father's peace, the court issued a three-year domestic violence restraining order (DVRO) against Mother for Father's protection and included the child as a protected party.  We conclude Mother's conduct—although demonstrating poor co-parenting—did not rise to the level of destroying Father's mental and emotional calm to constitute abuse within the meaning of the Domestic Violence Prevention Act (DVPA) (Fam. Code,[2] § 6200 et seq.).  Accordingly, we reverse.

---

[1]    Pursuant to the California Rules of Court, rule 8.90, governing privacy in opinions, we refer to the parties by first and last initials only.

[2]    All statutory references are to the Family Code unless otherwise indicated.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### *Child Custody Orders*

Mother filed a petition for dissolution in October 2015. A status-only judgment terminating the marriage was entered in November 2018.[3] The parties have a 10-year-old daughter (the child) and have been co-parenting under child custody and visitation orders. At the time relevant to this appeal, the child was eight years old and, pursuant to a family court order made on May 10, 2019, Mother and Father shared legal custody, Father had primary physical custody, and Mother had professionally supervised parenting time three days each week at a visitation center.

### II.

### *Father's DVRO Request*

In June 2019, Father filed a request for a DVRO seeking protection from Mother for himself and the child. He requested orders prohibiting Mother from abuse and compelling her to stay away from him and the child. He also sought a modification to the existing child custody orders to deny Mother parenting time until the hearing on his DVRO request, or alternatively to limit her time to professionally supervised video contact with

---

[3] For the limited purpose of establishing the dates of filing of the petition for dissolution and entry of the status-only judgment, we take judicial notice of the Register of Actions filed in a related appeal pending in this court, *L.R. v. K.A.* (D078331, app. pending), which arises from a child custody and visitation order issued on September 23, 2020. (Evid. Code, § 452, subd. (d); see *Dwan v. Dixon* (1963) 216 Cal.App.2d 260, 265 ["a court may take judicial notice of the contents of its own records"].)

the child.  Father alleged there was a risk that Mother would abduct the child.

Father's DVRO request was primarily based on an incident that had occurred on May 29, 2019, during Mother's scheduled parenting time with the child at the visitation center (the May 29 incident).  According to Father, he brought the child to the visitation center that day to see Mother, even though the child had been home sick from school for the past two days.  When they got to the lobby of the visitation center, the child "vomited almost immediately."  Moments later, Mother came into the lobby, even though she was required by court order to wait for the visitation monitor to conduct the exchange.  Upon seeing the child, "Mother refused to leave [her] side and caused great turmoil and anguish for everyone, especially [the child]."  Mother then argued for "about fifteen" minutes with the monitor in front of the child.

Mother "demanded" that Father take the child "right away" to urgent care.  Father agreed but told Mother she needed to stay away because it would not be a supervised visit anymore.  Mother "did not understand this," asserting that joint legal custody "gives her the right to attend the [medical] appointment."  At the hospital, Mother "held [the child] the whole time" and "proceeded to yell at [Father] in front of [the child]."  Father alleged she "videotaped [him] with her cell phone inches from [his] face, . . . put her hands in [his] face, and generally assaulted [him] the remaining time" they were there at urgent care.

After the child was discharged with strep throat, and police had responded, the incident continued in the parking lot.  Father alleged that as he pulled his car to the front of urgent care to take the child home, "Mother argued, yelled, accused, videotaped, harassed, and bullied three (3) grown

4

men who were employed by the San Diego Police Department," all while "holding [the child] in a death grip." Mother made four "faux attempts" to put the child in his car, each time the child "screamed at the top of her lungs and . . . refused to go in the car seat."

Father described one prior incident of alleged abuse that occurred on May 15, 2019, during another of Mother's scheduled parenting time with the child at the visitation center (the May 15 incident). Although he did not provide much detail, Father alleged this incident was "similar" to the May 29 incident and "ended when Mother abducted [the child] from [his] care by driving off." On May 16, Father filed an ex parte application for an order to enforce the child custody and visitation orders on the basis of the alleged abduction. The trial court denied the application and directed Father to seek assistance from law enforcement and the child abduction unit of the San Diego County District Attorney's Office.

Based on these allegations, on June 10, 2019, the trial court issued a temporary restraining order (TRO) enjoining Mother from having any contact with Father and the child. Father was given temporary sole legal and physical custody of the child, and Mother was denied further parenting time until the hearing on the merits of Father's DVRO request. On July 1, 2019, Mother's request for a continuance of the DVRO hearing to February 13, 2020 was granted. The court re-issued the TRO with modified child custody orders, allowing Mother to resume professionally supervised parenting time.

III.

*The Evidentiary Hearing*

At the evidentiary hearing on Father's DVRO request, held over two days in February 2020, four witnesses testified: San Diego Police Officer Gordon Leek, Father, Mother, and Mother's sister (K.R.). Evidence of the

5

police bodycam video recordings of the May 29 incident were also admitted.[4]

We summarize the evidence presented at the hearing.[5]

A.    *Officer Leek's Testimony*

Three San Diego police officers, including Officer Leek, responded to a call regarding "domestic violence occurring now" at the Sharp Hospital Urgent Care Center on May 29, 2019.  "[A]fter being there for over two hours," Officer Leek determined that the incident "boiled down to being a child custody dispute."

---

[4]    Mother has moved to augment the record with certain video exhibits and related transcripts.  (Cal. Rules of Court, rule 8.155(b)(1).)  These include a 3-minute, 47-second video that Mother recorded (Exhibit 5L), and two bodycam videos recorded by Officer Leek, the first being 13 minutes, 24 seconds in length (Exhibit B1) and the second being 22 minutes, 54 seconds in length (Exhibit B2).  Mother also moves to augment with an April 30, 2019 ex parte application and order directing Father to provide Mother supervised visits.  Mother contends each of these exhibits is necessary to provide a "clear picture" of both the May 29 incident and the timeline of events in this case.  Father does not oppose Mother's request to augment the record with excerpts of the video exhibits and related transcripts that were admitted into evidence at the hearing.  He opposes the request to include the April 30, 2019 ex parte application and order since it was not admitted into evidence.  We grant Mother's motion as to only those portions of the video exhibits and related transcripts that were admitted into evidence, and in deciding this appeal, we have reviewed this evidence.  Mother's motion to augment the record is otherwise denied.

[5]    Because this appeal implicates the substantial evidence standard of review, we accept as true all evidence tending to establish the correctness of the trial court's findings and resolving every conflict in favor of the judgment.  (*In re Marriage of G.* (2017) 11 Cal.App.5th 773, 780 (*Marriage of G.*).)  As to K.R.'s testimony, the trial court did not find her testimony "particularly beneficial" and questioned her credibility and objectivity.  We therefore do not consider and need not include a summary of K.R.'s testimony.

When he first arrived, Officer Leek saw "some heated debate" between Mother and Father in the hospital hallway. "Both [parties] seemed to want to talk to [Officer Leek] at the same time, and [he] tried to separate them and figure out what was going on." But other than "some semi-heated debate," Officer Leek did not observe "any altercations" between the parties inside the hospital. Father did not report to Officer Leek he had been "assaulted" by Mother that day.

When the child was taken into the examination room by medical staff, Officer Leek joined the parties there. He observed that the "child was calm," Father was "calm," and Mother was "neutral." When the examination finished, the parties went outside to the parking lot where Officer Leek saw Mother try to put the child in Father's car two to three times. Each time Mother tried, the child screamed. The child had her "arms strongly wrapped around [Mother's] neck" and her feet "wrapped around [Mother's] body." K.R. also tried to help put the child in the car but it "[d]id not go well."

At one point, Mother sat down on the curb with the child still wrapped around her. The child, as could be seen in the bodycam video recording, "was screaming she does not want to go with dad." Father told Officer Leek that he expected Mother was "going to be contesting putting the child in the car" and he "insisted" on taking the child home that day because he had "a hundred percent physical custody." Father told Officer Leek that "basically they went through this a couple of weeks ago . . . [and] he did not want to let the child go with [Mother] that night."

To resolve the situation, Officer Leek wanted one of the parents to "cooperate," by which he meant one of them would "back down so the screaming would stop." Officer Leek felt this was the only solution because he didn't want to "physically rip the child off of [Mother's] neck," and Mother

7

was not making a good faith effort to place the child in the car. He agreed with his sergeant who told Mother: "I'm not going to take any little kid's arm from yours, from you, and put them in the car. I'm not going to do that. And if [the child] doesn't want to let go and you can't get her in the car, then I guess she's going to stay with you."

In Officer Leek's experience, one parent will usually back down within 15 or 20 minutes. On this call, however, the situation lasted for approximately two and a half hours. He found both parents "uncooperative" in the sense that Father wanted to assert his legal rights while Mother "was just uncooperative in many ways." Ultimately, the child went with Mother under "protest of [the] father," who was "making allegations that [Mother was] abducting the child."

Officer Leek did not believe it was child abduction for Mother to take the child home because "there was no maliciousness" on her part. But he found "this child custody dispute" to be "concerning" because it was "unnecessary and unneeded." In his 28 years of experience, "this would be top three of calls [he has] had to deal with," leading him to request the presence of his sergeant because of how unproductive the situation had become. In his opinion, it "could have been handled quickly and decisively," without police intervention and "all that screaming" and "tortur[ing] [of] a child." Officer Leek believed that a doctor (Mother) and a teacher (Father) should have been able to "completely avoid[ ]" the situation.

When asked whether he believed "one of the parties was the aggressor," Officer Leek answered: "Yes. I wouldn't say the word aggressor. I would say more of an agitator." He identified Mother as the agitator, and believed the situation "went downhill so quickly" because of Mother's "attitude" and her "belligerent behavior" for nearly the entire time he was present. He believed

8

Mother did not make a "good faith, genuine effort" in following his instructions to put the child in Father's car. On the other hand, Officer Leek described Father as "extremely calm" and "very professional."

Officer Leek had no concerns about the child's physical welfare, other than she was sick, and no concerns about the child's emotional or mental welfare during the incident. Father's attorney then asked (in a leading question) if Officer Leek believed the "mother's actions were harmful to the child," and Officer Leek testified that, based on his personal experience of raising three kids, "this scenario was definitely not good for a kid."

B.    *Father's Testimony*

Father took the child to the May 29 supervised visit to see Mother even though he was "conflicted" about it. The child had been sick the day before and had vomited that day, and he was concerned "her health would make it a difficult visit." On the other hand, Father believed it would be "beneficial" for the child to see Mother since their visits had been suspended for two weeks.

When Father arrived with the child to the visitation center, they met with the monitor on the first floor to facilitate the exchange. However, Mother came down from the upper floor, where she had been instructed to wait for the monitor, and "surprised" them. It was then that the child vomited. Mother picked her up and "right away started to condemn" Father for "roughly five to ten minutes" for not taking the child to the doctor earlier. The monitor directed Mother to stop and took her upstairs to speak with her one-on-one. When Mother came back down, she was "very agitated" and "demanding" that Father take the child to the urgent care immediately.

Father decided "it was in everybody's best interest to take [the child] to get immediate medical help, . . . the situation had really escalated with [the monitor] losing control because of [Mother's] loud voice and the events that

9

occurred right in front of [the child]." Father "agreed" with Mother that she could come to urgent care, but he repeatedly told her that she could not be "in the proximity of [the child]" without a monitor present. The monitor had offered to go with Mother so that she could continue the supervised visit at urgent care, but Mother declined her offer.

Mother arrived at the urgent care less than five minutes after Father did, immediately took the child from him, and began to "criticize" him again for the child's condition. Father did not like Mother holding the child, he felt upset that the child sought to be comforted by Mother and not him, and he felt that Mother was "overstepping her boundaries and not allowing [him] to give [the child] the comfort and the support [he] was entitled to give." Father believed Mother not only broke their agreement that she would be in passive attendance at the urgent care visit, but that she was violating the child custody orders by holding the child. He also felt "insulted" that Mother was accusing him of not taking proper care of the child.

When he thought the situation was going to "be heated," Father moved away from Mother to get some space, but "she followed [him] to an area where [they] could talk a little bit but still in earshot" of people in the waiting room. Mother began to film Father with her phone "[i]nches away" from his face. This caused Father to feel "threatened" and "harassed." He felt "angry by the fact that [he] had agreed to allow her . . . to go to urgent care on [his] watch" and she "would come in and create an instantly chaotic, emotionally damaging situation." Needing to get "some control," Father asked a security guard to call the police. He told the security guard: "[T]his is out of control. We have a custody issue. I'm getting harassed. She's sticking the phone in my face." The police responded within "15 minutes or less."

Around the time that the police arrived, the parties took the child into an examination room to be seen by a doctor. Inside the examination room, Mother was "very aggressive" and "[s]he asserted [sic] herself into the doctor's diagnosis." Father became "very concerned because [he] saw a heightened emotional level" in the child and "a doctor who wasn't able to do his job and who was now trying to play between these two opposing parties." Mother's behavior "caused too much anxiety" for Father, and he felt "excluded" in the decision-making process. Father also felt "offended" because Mother took over the discussions with the doctor about the child's medical condition. To try to diffuse the situation, Father left the examination room and waited in the attending area. He felt leaving was "best for the physician and best for [the child]" because "she was being put in between two parents who desperately want to see her get healthy but who were placing her in harm's way." The child was discharged with strep throat.

Once outside the hospital, Father wanted to take the child home, but the child held tight to Mother and refused to go with him. Mother attempted to put the child in Father's car multiple times and told the child that she needed to go with Father. Each time, the child screamed "at the top of her lungs" that she wanted to go with Mother. Father believed that Mother could have tried harder to get the child into his car, and he continued to insist the child leave with him because he had physical custody. Father explained: "It was my sincere hope that [Mother] would make a good faith effort in helping [the child] understand that she needed to go with me. This was the second time this [child custody] order . . . had been thrown to the ground and not followed. [¶] And I was concerned about the consequences of her staying with her mom, being sick for multiple days, and how that would affect my

11

relationship with her and her ability to connect with me and do what I was asking her to do and be a good father for her."

Father acknowledged that one of the officers told Mother that the child could go home with her since the child refused to leave with him. Ultimately, Mother took the child home with her on May 29 and kept her for five days. Father eventually picked up the child from school the following Monday. Immediately following the May 29 incident, Father felt "[u]tter turmoil, emotional turmoil" and "devastated" because the child was not with him and he felt "powerless to do anything" in the moment.

When asked if Mother had previously engaged in "this type of harassing behavior," Father described the May 15 incident. On that day, after Mother's supervised visit ended, the child was "screaming at the top of her lungs," hyperventilating, and arguing with Father and the monitor that she did not want to go home with him. Mother then came downstairs a few minutes later when the child had already been "emotionally distraught." The child ran into Mother's arms crying, and Mother began to comfort her. At this point, the monitor accused Mother of interfering and the monitor called the police. Mother videotaped Father and the monitor during this incident.

While they waited for the police to arrive, neither Mother nor Father was able to get the child into Father's car. During the one-and-a-half hours that they waited for the police, the child screamed "nonstop" and "begg[ed]" to leave with Mother. At some point, Mother told Father she was taking the child home with her and told him that when the police arrived, "to give them her phone number so [Father] could pick up [the child]." Father acknowledged that when he alleged Mother had "abducted" the child in his ex parte application, filed with the court on May 16, 2019, he had stated (under penalty of perjury) that he did not know where the child was. Father

12

admitted this was a "false" statement. After Mother left with the child, Father did not inquire of the monitor whether the police ever arrived that night and he "made no effort" to pick up the child from Mother's residence.

Another incident where Father felt "harassed" by Mother occurred in March 2018 at the child's school where the police were called. When Father arrived at the school, Mother was "irately communicating" with the police and school administrators while videotaping Father and yelling at him in the child's presence. Father testified there have been three welfare checks at his home by the San Diego Police Department and six to seven visits from a Child Welfare Services social worker, in the last two years. Although he did not initiate these services, Father did not testify Mother did either.

Father believed Mother violated the TRO on January 20, 2020 when, at a scheduled exchange of the child at Mother's home, Father saw Mother videotaping him as he was outside leaving her residence. It made him feel "uncomfortable." Mother has filmed him on other (unspecified) occasions when he was picking up the child at school on his custodial days, making him feel "[t]hreatened" and "[o]dd." Father also testified Mother violated the TRO when she sent him "e-mails . . . threatening and signing it under [her sister K.R.'s name]."[6] Father agreed that the "majority" of his disputes with

------

[6]    When K.R. testified, Father's attorney inquired about one email sent to Father on January 9, 2020. K.R. testified she sent it, and it was about Father's allegedly late cancellations of scheduled visits interfering with Mother's cancer treatments. When Mother's attorney attempted to inquire further on the subject, the court questioned its relevance and Mother's attorney explained that she was attempting to establish that Mother did not send any emails to Father in violation of the TRO. Both Father and the court then stated, "that's been established."

13

Mother, who is herself a doctor, in the last 12 months centered on the child's medical care.

C.   *Mother's Testimony*

Mother testified that when she first saw the child on May 29, the child was vomiting on the floor. The child then got up and ran into Mother's arms and said she was feeling "sick and nauseated." The monitor told Mother the visit would be cancelled because the child was "too sick." Concerned about the child's condition, Mother had a "disagreement" with Father and the monitor about taking the child to urgent care immediately, but they "yell[ed]" at Mother that the child needed to go home with Father since the child had a doctor's appointment scheduled for the following day. During this exchange, Mother was video recording Father, but claimed a prior family court order permitted the parties to do so during exchanges.

Mother refused to place the child in Father's car until Father agreed to take her to urgent care. Eventually, Father agreed to take the child to urgent care and to have Mother follow them there. Based on their agreement, Mother placed the child in Father's car. Mother was otherwise aware that she was required by court order to leave the visitation center immediately after her supervised visit.

 Once at the urgent care lobby, Mother held the child as they waited for the doctor. Soon after their arrival, Father asked the security guard to call the police because Mother was violating the court order by holding the child. This led Mother to begin filming Father again "for protection," which she then continued to do for "the majority of the time" they were at the hospital at a distance of "several feet" from Father.

Mother described herself during the May 29 incident as a "distressed mother," "a mama bear, protecting my child." Mother believed that there was

nothing she could say to the child to get her to go with Father after the urgent care visit. She explained the only reason she was able to get the child in the car earlier at the visitation center was because she assured the child that she would join her at the urgent care. When asked if she violated the court order by taking the child home after the urgent care visit, Mother invoked her Fifth Amendment right upon advice of her attorney.

As for the May 15 incident, Mother testified she waited, as she had been instructed, for 15 minutes after the visit concluded before she went downstairs. Mother admitted she took the child home with her after the supervised visitation ended because the child "was in distress," "crying and in fear," and refusing to leave with Father. However, she told Father that she was taking the child home with her and to call her when the police arrived. Mother did not believe she was violating the court order because, she claimed, the police had previously told her the child could leave with her if she was distressed and refused to go with Father. Mother acknowledged the court order itself made no exception if the child was in distress.

D.     *The Trial Court's Ruling*

The trial court ruled that Father met his burden of proof in demonstrating that Mother had committed "domestic abuse" and issued a three-year DVRO protecting Father and the child against her.

The court found it "certainly true" that Mother "is passionate about her daughter's welfare" but concluded that Mother's conduct during the May 29 incident was "obsessive," and that she was "aggressive and controlling" in her demands that Father take the child to urgent care when "[s]he did not need emergency care." It found Mother's conduct "escalated an already emotionally intense situation, and subjected both the [Father] and the child

15

to further distress," and "she manipulated that child's already sensitive emotional state to a degree that was not acceptable."

The court found "from the video" that her "tone, demeanor, and manner was aggressive. Her speech was rapid and persistent throughout, with both the police officers and with the [Father], and in no way did she act to lessen the anxiety and tension of the circumstance. She acted in quite the opposite."[7] Recalling Officer Leek's testimony that this was "one of the worse" calls regarding "domestic issues between parties" of his 28-year career, the court found Mother "escalated [the situation] beyond control."

The trial court found that the May 29 incident "was a completely avoidable circumstance" had Mother "simply abided by the boundaries and parameters of the Court's [child custody] orders." It found that Mother "focuses on the decision-making and the choices being made by [Father] in terms of how he is choosing to parent the young [child] . . . who, unfortunately, has fallen victim to the conflicts between these two individuals." The court determined that Mother "simply did not belong at the hospital and had no business being there."

Although the trial court "focus[ed] its decision" on Mother's conduct during the May 29 incident, it found "relevant" that there was a "prior incident" on May 15 "where [Mother] did not leave the visitation, as required

---

[7]     The video exhibits admitted at the hearing provide support for the trial court's description of Mother's conduct. We accept these findings and do not reweigh the evidence. But we do note that Mother's interactions in the urgent care parking lot appear to be almost entirely with the police officers, and not with Father. Indeed, when Father attempted to speak to her, Mother can be heard responding, "Please don't talk to me. [Father], please don't talk to me."

16

by the [child custody] order." The court made no findings that Mother violated the TRO.

Based on these findings,[8] and relying on *In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483 (*Nadkarni*) and progeny cases, the trial court concluded Mother had committed abuse within the meaning of the DVPA by disturbing Father's peace and mental calm. In particular, the court relied on *Rodriguez v. Menjivar* (2015) 243 Cal.App.4th 816, 817 (*Menjivar*) and *Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140 (*Burquet*) to find that "controlling and coercive behavior" and "an unwanted course of conduct" can violate a person's peace and mental calm and constitute domestic abuse.

Finally, the court included the child as an additional protected party in the DVRO "based on the fact that [Mother] has a disregard for court orders." The court found that Mother's behavior "very clearly" shows that while she believes she is acting in the child's best interest, each time "she drove away with [the child] . . . because [Father] ended up giving in and allow[ed] the [child] to be taken away by Mother," Mother "persists in acting in a behavior that is incredibly detrimental to her daughter's best interests."[9]

---

8     Father testified he "felt threatened" and "harassed" when Mother was "sticking the phone in [his] face." Father's attorney argued that this happened "repeatedly" and that Mother filmed him "for two hours." The trial court did not make any findings as to Mother's video recordings, and Father did not refute Mother's claim that a prior family court order permitted the parties to video record exchanges of the child. We do note from the video evidence in our record that none shows Mother holding a phone "in [Father's] face." Instead, Mother held her cell phone close to her body and directed it at whomever was close to her at the time, which was primarily the police officers.

9     We are aware the trial court likely had in mind the history of what appears to be a long, contentious custody battle between the parties in a nearly five-year-old dissolution case. Indeed, in his closing remarks, Father's

DISCUSSION[10, 11]

On appeal, Mother contends the trial court erred in issuing the DVRO. Although we agree with the trial court that Mother's behavior did nothing to

---

attorney argued that "Dr. Sparta testified at length that he believes there is a cognitive inability for [Mother] to consider her own wrongdoing." Since Dr. Sparta did not testify at the DVRO hearing, we infer that Father's attorney was referring to evidence introduced at a different proceeding. However, no such evidence was introduced at the DVRO hearing and no such evidence was relied on by the trial court in issuing the DVRO. Because we are constrained by the record before us, we limit our review to the evidence considered by the court in rendering its decision. (*Estate of Johnston* (1967) 252 Cal.App.2d 923, 931 [invoking "well-established rule of appellate review that this court cannot consider matters which are not included in the record on appeal"].)

[10] Mother moved to strike the declaration of the director of the visitation center, incident reports for the May 15, 2019 and May 29, 2019 supervised visits, and a September 29, 2020 trial court order, as well as portions of Father's responding brief on appeal that rely on these records. Because none of these records were admitted at the hearing, nor relied on by the trial court in its decision, or were events that occurred after the trial court rendered its decision, we grant Mother's motion to strike the records and any portions of Father's brief referencing them.

[11] Father moved to strike Mother's brief in its entirety because it fails to comply with the California Rules of Court. Mother is presently represented by counsel, but she initiated this appeal as a self-represented litigant. A person who forgoes attorney representation is not exempt from the rules of appellate procedure or relieved of her burden on appeal. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246–1247 [self-represented litigants "must follow correct rules of procedure" and their failure to do so forfeits any challenge on appeal].) Mother's burden on appeal includes the obligation to provide a statement of facts in her opening brief conforming with California Rules of Court, rule 8.204(a)(2)(C), which requires a "summary of the significant facts limited to matters in the record." Under this rule, Mother is required to "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." (Cal. Rules of Court, rule 8.204, subd. (a)(1)(C).) Mother does provide citations to certain portions of the record, but these citations are few and far between.

lessen the anxiety and tension at the May 29 incident, and it demonstrated poor co-parenting by her, we conclude that Mother's conduct did not rise to the level of destroying Father's mental and emotional calm to constitute abuse within the meaning of the DVPA.

I.

*Standard of Review*

We review the trial court's grant or denial of a DVRO request for an abuse of discretion. (*In re Marriage of Davila & Mejia* (2018) 29 Cal.App.5th 220, 226.) " 'To the extent that we are called upon to review the trial court's factual findings, we apply a substantial evidence standard of review.' " (*Marriage of G.*, *supra*, 11 Cal.App.5th at p. 780.) "We draw all reasonable inferences in support of the court's ruling and defer to the court's express or implied findings when supported by substantial evidence." (*J.M. v. G.H.* (2014) 228 Cal.App.4th 925, 935.) "All conflicts in the evidence are drawn in favor of the judgment," and "[w]hen supported by substantial evidence, we must defer to the trial court's findings," including its finding on the credibility of witnesses. (*Niko v. Foreman* (2006) 144 Cal.App.4th 344, 364–365.)

However, "[j]udicial discretion to grant or deny an application for a protective order is not unfettered. The scope of discretion always resides in the particular law being applied by the court, i.e., in the ' "legal principles governing the subject of [the] action[.]" ' " (*Nakamura v. Parker* (2007) 156 Cal.App.4th 327, 337.) Here, "we consider whether the trial court's exercise

---

Although this would be a sufficient basis to conclude that Mother has waived her claims (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881), we exercise our discretion to review the merits.

of discretion is consistent with the [DVPA's] intended purpose." (*People v. Rodriguez* (2016) 1 Cal.5th 676, 685.) " 'If the court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, the court has not properly exercised its discretion under the law. [Citation.] Therefore, a discretionary order based on an application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion and is subject to reversal. [Citation.]' [Citation.] The question of whether a trial court applied the correct legal standard to an issue in exercising its discretion is a question of law [citation] requiring de novo review [citation]." (*Eneaji v. Ubboe* (2014) 229 Cal.App.4th 1457, 1463.)

## II.

### *"Disturbing the Peace of the Other Party" Under the DVPA*

Under the DVPA, a court may issue a protective order "to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence" (§ 6220), upon "reasonable proof of a past act or acts of abuse" (§ 6300, subd. (a)). The statute should "be broadly construed in order to accomplish [its] purpose" of preventing acts of domestic abuse. (*Nadkarni, supra,* 173 Cal.App.4th at p. 1498.)

The DVPA defines " 'abuse' " as intentionally or recklessly causing or attempting to cause bodily injury, sexual assault, placing a person in reasonable apprehension of imminent serious bodily injury to that person or to another, or engaging in any behavior that could be enjoined pursuant to section 6320. (§ 6203, subd. (a).) "Abuse is not limited to the actual infliction of physical injury or assault." (§ 6203, subd. (b).) Rather, it includes a broad

20

range of harmful behaviors enumerated under section 6320, including threats, stalking, annoying phone calls, vandalism, and most relevant here, "disturbing the peace of the other party." (§ 6320, subd. (a).)

A.      *Subdivision (c) of Section 6320*

Effective January 1, 2021, section 6320 was amended by Senate Bill No. 1141 (2019-2020 Reg. Sess.) (Senate Bill 1141) to add subdivision (c), which defines " 'disturbing the peace of the other party' " as "conduct that, based on the totality of the circumstances, *destroys* the mental or emotional calm of the other party." (§ 6320, subd. (c); Stats. 2020, ch. 248 (Sen. Bill 1141), § 2, italics added.) The "conduct may be committed directly or indirectly, including through the use of a third party, and by any method or through any means including, but not limited to, telephone, online accounts, text messages, internet-connected devices, or other electronic technologies." (§ 6320, subd. (c).)

Subdivision (c) of section 6320 then identifies "coercive control" as but one example of conduct that could disturb the peace of the other party. "Coercive control" is defined as "a *pattern of behavior* that in purpose or effect *unreasonably interferes with a person's free will and personal liberty*." (§ 6320, subd. (c), italics added.) It is conduct that can include "unreasonably engaging in any of the following: [¶] (1) Isolating the other party from friends, relatives, or other sources of support. [¶] (2) Depriving the other party of basic necessities. [¶] (3) Controlling, regulating, or monitoring the other party's movements, communications, daily behavior, finances, economic resources, or access to services. [¶] (4) Compelling the other party by force, threat of force, or intimidation, including threats based on actual or suspected immigration status, to engage in conduct from which the other party has a right to abstain or to abstain from conduct in which the other party has a right to engage." (§ 6320, subd. (c)(1)–(4).)

21

The legislative history of the amendment to add subdivision (c) to section 6320 reveals that it was to "codif[y] and elaborate[ ] on case law defining when a restraining order under the [DVPA] may be issued because a person was 'disturbing the peace of the other party' (§ 6320), which includes coercive control." (Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill 1141, as amended Aug. 6, 2020, p. 1.)[12] This history references several articles, studies, and cases highlighting that coercive control and psychological abuse are "pervasive form[s] of abuse." (Assem. Com. on Judiciary, Analysis of Sen. Bill 1141, as amended Aug. 6, 2020, pp. 3–5.)

The legislative history also indicates the amendment of section 6320 was intended to "build[ ] on existing law and [was] not, in any way, meant to reduce the protections available under existing law to victims of domestic violence[.]" (Assem. Com. on Judiciary, Analysis of Sen. Bill 1141, as amended Aug. 6, 2020, p. 6.) The amendment drew on existing case law to define " 'disturbing the peace of the other party,' " including: *Nadkarni, supra*, 173 Cal.App.4th 1483; *N.T. v. H.T.* (2019) 34 Cal.App.5th 595 (*N.T.*); *Burquet, supra*, 223 Cal.App.4th 1140; *In re Marriage of Evilsizor & Sweeney* (2015) 237 Cal.App.4th 1416 (*Marriage of Evilsizor*); and *Menjivar, supra*, 243 Cal.App.4th 816. (*Id.* at pp. 5–6.) We discuss *Nadkarni* and its progeny next.

_____

[12] We take judicial notice of this report and the other legislative materials referenced herein to aid in our interpretation of the phrase "disturbing the peace of the other party." (*In re J.W.* (2002) 29 Cal.4th 200, 211 [court may take judicial notice of legislative history]; see *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 34–35, 39 [identifying legislative history documents that a court may take judicial notice of].)

22

B.     *Nadkarni and its Progeny*

The first case to interpret the meaning of the phrase "disturbing the peace of the other party" under the DVPA was *Nadkarni*.  In *Nadkarni*, the former husband accessed his ex-wife's email account during a child custody dispute.  (*Nadkarni, supra*, 173 Cal.App.4th at pp. 1488–1489.)  The email account was private and the ex-wife used it for confidential matters, including to communicate with her clients and her family law attorney.  (*Id.* at p. 1489.)  The former husband copied some of these emails and filed them in the child custody case.  (*Id.* at pp. 1488–1489.)  He claimed he had more emails in his possession that were " ' "inflammatory and sensitive" ' " to others and suggested that he may introduce them in future legal proceedings.  (*Id.* at p. 1490.)  He also used information obtained from the email account to subpoena third parties to find out what social events his ex-wife would be attending and told others that he knew which social events she attended within the past three months.  (*Ibid.*)  The ex-wife sought a restraining order, arguing that, with the former husband's history of physical and emotional abuse, she feared for her safety and feared that he would use the improperly-obtained emails " 'to control, harass, and abuse' her if he were not enjoined from such conduct."  (*Id.* at p. 1492.)

Although it issued a TRO, the trial court subsequently dismissed the ex-wife's request for a restraining order "on the pleadings" without a hearing on the merits, finding that her former husband's conduct did not "rise[ ] to the level of conduct that is amenable to the Domestic Violence Prevention Act."  (*Nadkarni, supra*, 173 Cal.App.4th at p. 1493.)  On appeal, the trial court was reversed.  (*Id.* at p. 1501.)

The *Nadkarni* court construed the phrase " 'disturbing the peace of the other party' " to mean "conduct that destroys the mental or emotional calm of

23

the other party." (*Nadkarni, supra,* 173 Cal.App.4th at p. 1497.) It reached that conclusion based on the ordinary meaning of " 'disturb' " and " 'peace,' " and found support for its interpretation in the legislative history of the DVPA. (*Id.* at pp. 1497–1498.) Enacted in 1993, the DVPA collected from earlier provisions for the issuance of domestic violence restraining orders in several former statutory schemes, with each of these provisions authorizing a DVRO that enjoined " 'disturbing the peace' " of the other party. (*Id.* at p. 1498.) The court also found support in the 1979 Domestic Violence Prevention Act (Code Civ. Proc., former § 540 et seq.), which similarly had a " 'protective purpose,' " intended " 'to provide more protective orders to a broader class of victims of domestic violence.' " (*Ibid.*) The court concluded that the Legislature's intent was to "broadly construe[ ]" the DVPA in order to accomplish its purpose. (*Ibid.*) It thus held that " 'disturbing the peace' " may include the former husband's conduct in accessing, reading, and publicly disclosing his ex-wife's confidential emails. (*Ibid.*)

*Nadkarni* has since been followed by appellate courts to support the issuance of a DVRO for non-violent conduct deemed to disturb the peace of the other party. In *Burquet, supra,* 223 Cal.App.4th at pages 1142–1143, the court affirmed the issuance of a DVRO against an ex-boyfriend who initiated unwanted and unwelcomed contact with the petitioner for eight months after their breakup. His communications were "inappropriate and contained sexual innuendos." (*Id.* at p. 1142.) After she repeatedly turned down his overtures, the ex-boyfriend showed up at the petitioner's house "unannounced and uninvited" and refused to leave even when she threatened to call the police. (*Id.* at pp. 1142–1143.) The petitioner was "scared" because the ex-boyfriend on two prior occasions had gotten angry and "physical" with her. (*Ibid.*) The court of appeal concluded there was substantial evidence to

support the issuance of the DVRO, finding that the ex-boyfriend's "course of conduct" disturbed the petitioner's peace as defined by *Nadkarni*. (*Id.* at pp. 1144, 1147)

In *Marriage of Evilsizor, supra*, 237 Cal.App.4th at page 1420, a husband downloaded "tens of thousands" of his wife's text messages and notes she kept on her cell phone, which she used as a diary. He then went "uninvited" to the home of his wife's parents and disclosed "private and sensitive" information about her to them. (*Ibid.*) He filed copies of some of the messages during the dissolution proceedings, and he also hacked into his wife's Facebook account, changed her password, and changed the email address associated with the account to his own. (*Id.* at pp. 1420–1421.) The trial court concluded, and the Court of Appeal agreed, that husband disturbed wife's peace " 'because [he was] going around either disclosing or threatening to disclose to third parties for no particular reason intimate details of [their] lives[.]' " (*Id.* at p. 1425.)

In *Menjivar, supra*, 243 Cal.App.4th at pages 817–819, an ex-girlfriend requested a DVRO because, throughout their relationship and in addition to being physically abusive, her ex-boyfriend was controlling, called her multiple times a day, and isolated her from others. The ex-boyfriend enrolled in three of the woman's four college classes to monitor her, required her to keep a telephone call open during the one class in which he was not enrolled and while she was at home so that he could continue monitoring her. (*Id.* at p. 817.) The ex-boyfriend also played with a knife close to her face, threatened to beat her with a studded belt, threatened to send her to jail, took her phone away when she tried to call for help, drove erratically during a ride to the hospital while she was pregnant, and threatened to drive into the path of an oncoming train. (*Id.* at pp. 817–818.)

Despite these and other incidents, the trial court in *Menjivar* denied the ex-girlfriend's request, finding that the evidence of physical abuse was too remote in time and the evidence of mental abuse and controlling behavior were not relevant to its determination. (*Menjivar, supra,* 243 Cal.App.4th at pp. 818–819.) The appellate court reversed because "[m]ental abuse is relevant evidence in a DVPA proceeding." (*Id.* at p. 821.) The court held that the testimony before the trial court "revealed significant acts of emotional abuse, well beyond accessing and disseminating texts and e-mail. The acts of isolation, control, and threats were sufficient to demonstrate the destruction of [the ex-girlfriend's] mental and emotional calm." (*Id.* at p. 822.)

In *N.T., supra,* 34 Cal.App.5th at pages 597, 600, a wife sought a DVRO because her husband repeatedly violated a TRO, which ordered, among other things, that he limit communications with her to " '[b]rief and peaceful contact' " concerning visitation. At several child custody exchanges, however, the husband refused to hand over the child until his wife engaged in conversation with him. (*Id.* at p. 598.) The husband had become more " 'aggressive with his constant harassment,' " urging his wife to kiss him and hold his hand, and telling her that she had demons and that she had responsibilities as his wife. (*Ibid.*) He also once followed the wife after a visitation exchange, was once seen " 'around [the wife's] house' " despite the fact that her address was confidential pursuant to the TRO, and once took the child from the wife at a time and in a place that was not agreed upon in the TRO. (*Id.* at pp. 599–600.) He also gave the wife a letter at one exchange, which "quoted or paraphrased several verses from the Bible regarding overcoming sin and demons, intermixed with [husband]'s comments regarding [wife]'s 'dirtiness' resulting from her childhood experiences." (*Id.* at p. 600.) The trial court denied the wife's DVRO request

26

because it found that " 'technical violations of the TRO' " did not constitute domestic violence. (*Id.* at p. 601.) On appeal, the court held that the conduct alleged, even without the existence of a TRO, would be sufficient to destroy the wife's mental or emotional calm and thus "would have justified the issuance of a DVRO on their own." (*Id.* at p. 603.)

C.    *"Guardrails"*

In amending section 6320, the Legislature intended to "better protect[ ] victims of domestic violence by . . . codifying language from case on law on destroying the other party's mental or emotional calm" and specifically including "coercive control" within the definition of "disturbing the peace of the other party." (Assem. Com. on Judiciary, Analysis of Sen. Bill 1141, as amended Aug. 6, 2020, p. 1.) But the Legislature was also concerned about expanding the scope of abusive conduct beyond what was necessary, taking care to "to limit the application of its provisions to clearly abusive behaviors." (Sen. Judiciary Com., Analysis of Sen. Bill 1141, May 6, 2020, p. 7.) For instance, the examples of coercive control added to the statute set forth certain parameters—"a mental state, *objective reasonableness*, causation, foreseeable harm, actual harm"—to "provide *strong guardrails* to help ensure that the bill will function as intended and not reach benign conduct that is ordinarily tolerated in relationships or that does not actually distress the person." (*Id.* at pp. 7–8, italics added.)

These "guardrails" are necessary because "[a] protective order implicates fundamental liberty rights, as a violation of its provisions is a crime (Penal Code § 273.6), and it is a factor that is weighed in child custody and visitation determinations (see §§ 3011, 3030, 3044)." (Sen. Judiciary Com., Analysis of Sen. Bill 1141, May 6, 2020, p. 7.) As one court has noted, "a domestic violence restraining order is no ordinary injunction. Its violation

27

is punishable as a misdemeanor. (Pen. Code, §§ 166, subd. (c)(3)(A); 273.6.) Arrest is mandatory where an officer has probable cause to believe the order has been violated. (Pen. Code, § 836, subd. (c)(1).)" (*Curcio v. Pels* (2020) 47 Cal.App.5th 1, 13, fn. 6 (*Curcio*).) "Moreover, '[t]here often will be some social stigma attached while a person is subject to a protective order. Existing employers may frown on an employee who is subject to such an order and prospective employers almost surely will. Thus the restrained party may lose out on a promotion or a job.' " (*Ibid.*, quoting *Ritchie v. Konrad* (2004) 115 Cal.App.4th 1275, 1291 (*Ritchie*).) Further still, under section 3044, subdivision (a), a finding that a parent committed domestic abuse raises a rebuttable presumption that an award of sole or joint physical or legal custody of a child is "detrimental to the best interest of the child." (§ 3044, subd. (a).)

Respecting these guardrails, courts are concluding that "[t]he DVPA was not enacted to address all disputes between former couples, or to create an alternative forum for resolution of every dispute between such individuals." (*Curcio*, *supra*, 47 Cal.App.5th at p. 13.) In *Curcio*, the petitioner sought a DVRO against her ex-girlfriend who, like the petitioner, was a comedic performer. The petitioner alleged her ex-girlfriend had falsely and publicly accused her of physical and sexual assault in attempt to have her banned from the theater where the petitioner performed. (*Id.* at p. 4.) This included a Facebook post made by the ex-girlfriend containing vague assault allegations against the petitioner and urging people to not book her for performances. (*Id.* at pp. 5–6.) The trial court issued the restraining order on the basis of the Facebook post, finding that interfering with a person's ability to earn a living " 'would disturb the peace of any reasonable person.' " (*Id.* at p. 8.)

28

In reversing the trial court, the Court of Appeal held the evidence did not meet the *Nadkarni* court's definition of " 'disturbing the peace.' " (*Curcio, supra,* 47 Cal.App.5th at pp. 12–13.) It concluded that the ex-girlfriend's "single, *private* Facebook post accusing [petitioner] of abusing her is a far cry from the conduct described in [*Nadkarni, Marriage of Evilsizor*, and *Burquet*]." (*Id.* at p. 13.) Beyond that single post, there was no evidence that the ex-girlfriend sent the petitioner harassing, threatening, or unwanted texts or emails, as in *Burquet*, and there was no evidence that the ex-girlfriend published or distributed to third parties the petitioner's private information or messages, as in *Nadkarni* and *Marriage of Evilsizor*. (*Ibid.*) Although recognizing the petitioner "was upset by the social media post and it may have made her fear for her career," the court concluded "it cannot be said to rise to the level of destruction of [the petitioner's] mental and emotional calm, sufficient to support the issuance of a domestic violence restraining order." (*Id.* at p. 13.)

## III.

### *Mother's Conduct Did Not Constitute "Disturbing the Peace of the Other Party" Within the Meaning of the DVPA*

In this case, the trial court issued the DVRO on the basis that Mother's conduct disturbed Father's peace, relying on *Nadkarni* and its progeny cases. It correctly noted that courts have "define[d] disturbing the peace as conduct that destroys the mental or emotional calm of the protected party." The court also called out specifically *Menjivar* for the proposition that "controlling and coercive behavior" can violate a person's peace and constitute abuse, and *Burquet* for the proposition that "an unwanted course of conduct" can similarly constitute abuse. While these are generally true propositions, a comparison of Mother's conduct to the conduct in *Menjivar* and *Burquet*, and

29

the other *Nadkarni* progeny cases, compels us to conclude that the issuance of a DVRO on the facts of this case was improper because Mother's conduct was insufficient to support a finding that she "destroyed" Father's mental or emotional calm. The trial court, therefore, went over the "guardrails" put in place by the legislature to ensure the DVPA reached only "clearly abusive behaviors."[13] (Sen. Judiciary Com., Analysis of Sen. Bill 1141, May 6, 2020, pp. 7–8.)

As an initial matter, we accept the trial court's findings that Mother acted "obsessive[ly]" during the May 29 incident; that she was "aggressive and controlling" in her demands that Father take the child to urgent care; that Mother "escalated an already emotionally intense situation" and caused Father and child "further distress"; that Mother "manipulated [the] child's already sensitive emotional state"; that Mother had an "aggressive" tone, demeanor, and manner with the officers and Father; and that Mother violated the terms of the child custody orders and has shown a "persistent disregard for court [child custody] orders." The record demonstrates that there was substantial evidence to provide support for the trial court's interpretation of the evidence. We also have no doubt that Mother's behavior in her co-parenting with Father causes him (and the child) needless distress in an already emotionally fraught custody dispute. But that conduct, no

_____

[13] We recognize that when the DVRO was issued in this case, the trial court did not have the opportunity to consider the amendment to section 6320 and subdivision (c), which became effective on January 1, 2021 or *Curcio*, *supra*, 47 Cal.App.5th 1, which was issued the day after the court granted Father's request. Even so, the legislative amendment simply codified existing case law. (Assem. Com. on Judiciary, Analysis of Sen. Bill 1141, as amended Aug. 6, 2020, p. 3.)

matter how disagreeable, is not enough to establish domestic abuse within the meaning of the DVPA.

Mother's conduct is a far cry from the conduct in *Menjivar*, where the ex-boyfriend engaged in a pattern of behavior that intimidated, isolated, and controlled Rodriguez, to include calling her multiple times a day, monitoring her movements and conversations, playing with a knife near her face, threatening to beat her and send her to jail, preventing her from calling for help, and endangering her life while in a car. (*Menjivar*, *supra*, 243 Cal.App.4th at pp. 817–818.) In fact, the legislative history of the amendment to section 6320 refers to *Menjivar* as "a stark example of the type of harmful conduct that would be covered" by the amendment to section 6320. (Sen. Judiciary Com., Analysis of Sen. Bill 1141, May 6, 2020, p. 6.)

Nor is Mother's conduct anything similar to that in *Burquet*, where the court affirmed the issuance of a DVRO against an ex-boyfriend who engaged in an eight-month long campaign of unwelcomed and unwanted contact of his ex-girlfriend after a breakup and for having once appeared at her home unannounced and refusing to leave. (*Burquet*, *supra*, 223 Cal.App.4th at pp. 1142–1143.)

Mother's behavior is also unlike the pattern of behavior in *N.T.*, wherein the husband, during or after multiple child custody exchanges, refused to hand over the child unless the wife engaged in conversation with him "about issues in excess of those necessary" to custody exchanges (*N.T.*, *supra*, 34 Cal.App.5th at p. 603), requested intimate physical contact, followed the wife after an exchange, was once seen in her undisclosed neighborhood, took the child before the start of his visitation and from a different location than as set forth in the TRO, and handed the wife a letter in violation of the TRO (*id.* at pp. 597–600).

Mother's conduct, although distressful to Father, was also significantly different from the invasion of privacy and the threats to release private communications and diary entries, as in *Nadkarni, supra*, 173 Cal.App.4th 1483, and *Marriage of Evilsizor, supra*, 237 Cal.App.4th 1416, or the acts of following the other party and being observed in their undisclosed neighborhood, as in *N.T., supra*, 34 Cal.App.5th 595.

In this case, Mother's "aggressive and controlling" or "manipulat[ive]" conduct was in her demands that Father take the child to urgent care,[14] in her failure to make reasonable and good faith efforts to put the child in Father's car, and in her failure to lessen an emotionally intense situation —all during a single two-hour incident that ended with her taking the child home in violation of the custody order. There is a significant chasm between Mother's conduct and conduct that has been found by courts to have *destroyed* the mental peace or emotional calm of the other person under the standard of *Nadkarni*. Her conduct simply does not fall within the ambit of subdivision (c) of section 6320, such as unreasonably isolating the other party, depriving them of basic necessities, controlling or monitoring their movements, or compelling them by force or intimidation to engage in conduct that they have a right to abstain from or to abstain from conduct that they have a right to engage in. (§ 6320, subd. (c)(1)–(4).)

Trial courts are routinely presented with contentious disputes following the breakdown of a family unit. Some of these disputes can lead to physical abuse, unwelcome contact, threats, and coercion. In those contexts, a DVRO is the proper mechanism to protect the petitioning party. We are cognizant

14    We note that Mother had joint legal custody pursuant to the family court's child custody orders, which gave her equal rights and responsibilities to make decisions related to the child's health.

that this area of the law is not amenable to bright line rules and that trial courts must exercise their discretion based on the facts before them. That discretion, however, must be exercised within the legal bounds of the statute and in furtherance of the statute's intent and purpose. The Legislature sought to "limit the application of its provisions to clearly abusive behaviors." (Sen. Judiciary Com., Analysis of Sen. Bill 1141, May 6, 2020, pp. 7–8.) While the DVPA should "be broadly construed in order to accomplish [its] purpose" (*Nadkarni, supra,* 173 Cal.App.4th at p. 1498), it cannot be used to restrain "any act that upsets the petitioning party" (*Curcio, supra,* 47 Cal.App.5th at p. 13).

In that regard, it may be helpful to make explicit what was implicit in *Nadkarni* and its progeny, which is that a trial court must consider allegations of abuse not just through the subjective lens of the petitioning party, but also through an objective lens. In codifying *Nadkarni* and its progeny in section 6320, subdivision (c), the Legislature stated there must be "objective unreasonableness" in the conduct alleged to be coercive control. (Sen. Judiciary Com., Analysis of Sen. Bill 1141, May 6, 2020, p. 7.) Thus, section 6320, subdivision (c), defines coercive control as "a pattern of behavior that in purpose or effect *unreasonably* interferes with a person's free will and personal liberty" or where the other party "*unreasonably* engag[es] in" certain conduct. (Italics added.) " '[A]buse,' " itself, is defined to include "plac[ing] a person in *reasonable* apprehension of imminent serious bodily injury to that person or to another." (§ 6203, subd. (a)(3), italics added; see also § 6250.5 [authorizing the issuance of an ex parte emergency protective order to a police officer who "asserts *reasonable* grounds to believe that there is a demonstrated threat" (italics added)].) Similarly, the court in *Ritchie, supra,* 115 Cal.App.4th 1275, held that a contested request for the renewal of a

33

DVRO must be accompanied by a " '*reasonable* apprehension' of future abuse." (*Id*. at p. 1289, italics added.) "It is not enough [that the petitioner] entertain a subjective fear the party to be restrained will commit abusive acts in the future. The 'apprehension' those acts will occur must be 'reasonable.' " (*Id*. at p. 1288.)

We conclude the trial court abused its discretion in finding Mother's conduct "disturbed" Father's peace within the meaning of the DVPA because her conduct did not rise to the level of destroying Father's mental and emotional calm within the meaning of the DVPA. Our decision to reverse should not be interpreted as condoning Mother's behavior, including any violations by her of child custody orders. It does not. But under the laws governing child custody (§ 3000 et seq.), if a court determines that a parent's behavior is detrimental to a child's health, safety, or welfare, then the court has broad discretion to control the parent's interactions through the issuance or modification of child custody and visitation orders. (§ 3022 ["The court may, during the pendency of a proceeding or at any time thereafter, make an order for the custody of a child during minority that seems necessary or proper."].) The trial court had all the authority under the Family Code to handle, as described by Officer Leek, what "boiled down to . . . a child custody dispute." The DVRO, however, was not appropriate based on the facts of this case.

## DISPOSITION

The DVRO restraining Mother is reversed with directions to the trial court to enter an order denying Father's request for a DVRO. The parties are to bear their own costs on appeal.

DO, J.

I CONCUR IN THE RESULT:


BENKE, Acting P. J.


I CONCUR:


IRION, J.